THE FIRE DEPARTMENT OF THE CITY OF NEW YORK *v.* JAMES
WRIGHT, ALBERT W. WRIGHT and J. BUTLER WRIGHT. (*a*)

The constitutional questions determined by this court in the case of *The Fire De-
partment* v. *Noble* (*ante*, p. 440), having been raised and reärgued upon this ap-
peal, while that case was under advisement, the court adopt and affirm in this
cause, the decision therein made.

Accordingly, *held*, that the acts of the legislature of the state of New York—re-
quiring the agent of every individual or association of individuals, not incorpo-
rated by the laws of this state, to pay to the treasurer of the Fire Department
in the city of New York, for the use of that department, a percentage of all
premiums of insurance effected by such agent in that city, and prohibiting him
from making or procuring such insurance until he shall have executed a bond
with sureties, securing an accounting of premiums received, and the payment of
the percentage—are valid and constitutional enactments.

THIS action was brought upon a bond executed to the Fire
Department of the city of New York, in the penal sum of
$1,000, by the defendant, James Wright, as principal, and by
the other defendants as sureties.

It was delivered to the treasurer of the plaintiffs in May,
1849, pursuant to the act passed on the 30th of March of that
year, " to amend the acts in relation to insurances on property
in this state, made by individuals and associations unauthorized
by law." (Session Laws of 1849, chap. 178, p. 239 ; 2 R. S.
4th ed. p. 120.)

The provisions of this act, and of the statutes of 1824, 1829,
and 1837 thereby modified, together with the revised and
amended act of 1857 upon the same subject, are referred to
particularly in the report, at page 440 of this volume, of the
case instituted by the same plaintiffs against Noble and others.

The condition of the bond was, that the defendant, James
Wright, should annually render to the treasurer of the Fire
Department of the city of New York, on the first day of Feb-
ruary, a just and true account, verified by his oath, of all

---

(*a*) Affirmed in the Court of Appeals.

premiums which, during the year ending on the first day of September preceding the accounting, should have been received by him, or by any person for him, or should have been agreed to be paid, for any insurance against loss or injury by fire in the city and county of New York, which insurance should have been effected or the procurement of which should have been promised by him, from any individuals or association not incorporated by the laws of this state, and should annually pay to such treasurer two per cent. upon the amount of such premiums.

The complaint set up the act in question, the execution of the bond, and the breach of the condition; averring the receipt of premiums for insurances upon property in this city by the defendant, as agent of the Reliance Mutual Insurance Company of Philadelphia, and of the Insurance Company of North America of the same place, and a neglect to account for such premiums or to pay the percentage thereon, as provided by the law and required in the bond.

The answer, after putting in issue several of the allegations of the complaint which formed no ground of controversy on the appeal, averred that the bond was delivered, under a protest, written thereon, reserving a right to test the constitutionality of the law, and the answer alleged that the same was in contravention of the constitution of the United States.

On the trial of the cause, before WOODRUFF, J., and a jury, the bond was proved, and the defendants admitted that two per cent. upon premiums received by James Wright, for insurances upon property within this city, effected as the agent of companies incorporated in Pennsylvania, amounted, during two years next preceding September 1, 1852, to $1,000. The plaintiffs consented to that sum as the amount for which a verdict, if in their favor, might be rendered.

The defendants moved to dismiss the complaint, upon the ground that the act was in violation of the federal and the state constitutions. The motion was denied.

The protest of the defendants, of even date with and endorsed upon the bond, was then read, and the case was closed.

The Fire Department *v.* Wright.

The presiding judge having refused a request to charge that the statute in question was unconstitutional, the jury found a verdict in the plaintiff's favor, and a judgment was entered thereon for $1,221 95. The case now came up to the general term upon the defendant's appeal.

The argument in this cause took place while the case of the *Fire Department* v. *Noble* (*ante*, p. 440), which had been previously heard and submitted, was still under advisement.

*William A. Hardenbrook* and *William Curtis Noyes*, for the defendants, argued the following points :

The law passed March 30, 1849, and recited in the bond in suit in this action, is in violation of the constitution of the United States, and that of the state of New York, and is therefore void.

I. This law deprives a citizen of his property in an unauthorized manner. Const. N. Y. Art. I. § 6 ; Amendments to Const. U. S. Art. V. 1. Money is property. *Sutton's Heirs* v. *Louisville*, 5 Dana, 34 ; *People* v. *Mayor of Brooklyn*, 6 Barb. 244 per Barculo, J. 2. There are but three modes in which a citizen may be legally deprived of his property. First, By due process of law. This phrase, like the phrase "law of the land," imports a suit, trial and judgment, according to the course of the common law, or the usage of ordinary legal tribunals. (*Taylor* v. *Porter*, 4 Hill, 140). This is the only mode in which the property of a private 'citizen may be taken from him against his will, to be transferred to another private citizen. Second, By the exercise of the taxing power. Taxes are defined to be burdens or charges imposed upon persons or property, to raise money for public purposes. Third, By the right of eminent domain, where it is taken for the public use, and upon just compensation. In this case it is taken, not as the owner's share of contribution to the public burden, but as something beyond his share, for which all must unite in making him a special compensation. (*People* v. *Mayor of Brooklyn*, 4 Coms. 419.) The percentage in question does not fall under any of these three heads. 3. It is not a tax, because it is not imposed for

the support of government, or for any public purpose. It is essential that a tax should be for public uses. (See the cases cited by the plaintiff, and the general reasoning in *The People* v. *Mayor of Brooklyn*, 4 Coms. 419.) This contribution is levied solely for the benefit of, and payable to, and collectable by, a private citizen. The Fire Department is essentially a private, and not a public charity. (Law passed March 20th, 1798.) The public at large is excluded from all participation in its benefits. Indigent and disabled firemen, the members of this corporation, and their families alone, can receive a share of its advantages. Especially the very persons here taxed are prohibited from deriving any benefit from the institution. In every illustration adduced by the plaintiff, the tax payer may avail himself of the charity supported by his funds. 4. The law in effect pretends to take the property of one citizen and transfer it to another, which a government by its mere legislative act cannot do, even if it should direct compensation to be made. (*Van Horne's Lessees* v. *Dorrance.* 4 Dal. 310, 311; *Embury* v. *Connor*, 3 Coms. 511; *Taylor* v. *Porter*, 4 Hill, 140.) 5. The law contemplates a compensation in every case of taxation, as well as where property is taken by the right of eminent domain. In the case of taxation, the compensation being the benefit which the tax payer derives in the security of his property and other blessings flowing from the existence of government. It is doubtful if another case can be found where a contribution levied on the property of a citizen who is, by express law, excluded from any participation in the benefits resulting therefrom. 6. These views are not opposed to but rather derive confirmation from the consideration, that only the necessities of government authorize a tax at all. The citizen is bound to contribute, not because he receives protection, but because the government cannot exist without it. 7. This law is objectionable, as wearing the aspect of a double tax. The state may, and does, tax the agent in the ordinary manner, for all property in his hands, as well individually as in trust for, and belonging to, his principal. This is an additional impost, and illegal for that reason.

II. The law cannot be vindicated on the ground that the legislature may prohibit foreign corporations from transacting business within this state; and if it may prohibit, it may admit them under any restrictions which it chooses to impose. This argument is inconsistent with the claim that this law applies equally to the citizens of the state of New York. 1. As to the fact. First, This law may be regarded as operating solely upon the agent, and this percentage as payable by him individually to the fire department. Second, Or it may be regarded as applying equally to agents of individual insurers, citizens of this state, and not incorporated by the laws of this state. 2. As to the law, if the object of the statute be to restrict foreign insurers, it creates an unlawful restriction between the citizens of different states. First, The citizens of other states have an equal right with our own citizens to pursue any lawful trade or calling within the limits of this state, and may claim an exemption from higher taxes or impositions than are paid by the citizens of this state. (U. S. Const. Art. IV. § 2, subd. 1; *Corfield Coryell*, 4 Wash. C. C. R. p. 381.) This provision of the constitution may be esteemed the " basis of the Union." (Federalist, No. LXXX.) The provisions of the U. S. constitution securing equality of taxation, equality of commercial privileges, and freedom of commercial intercourse between the citizens of different states, clearly indicate the intention to place them on a footing of perfect equality, and to perpetuate the most unlimited freedom of trade and intercourse between them. (U. S. Const. Art. I., § 8, subd. 1; § 9, subd. 5; *Gibbons* v. *Ogden*, 9 Wheat. R. p. 231.) Compare Art. IV. of the original articles of confederation. Second, Citizens do not lose their rights when acting in a corporate capacity. Third, The court may look behind the " pure legal entity " and consider the citizens composing the corporation. (*Bank of U. S.* v. *Deveau*, 5 Cranch, 61; *Bank of Vicksburgh* v. *Slocomb*, 14 Pet. 60.) Fourth, In this point of view it may even be doubtful whether the legislature of a state has the power of prohibiting a corporation, all of whose corporators are American citizens, from transacting any lawful business within its territory.

*Augustus F. Smith*, for the plaintiffs, argued the case upon the points prepared by him in the case of the same plaintiffs against Noble, and which are printed, *ante*, p. 447.

BY THE COURT. INGRAHAM, FIRST J.—The questions argued in this case are the same as those in the case of the Fire Department against Noble and others, decided at the present term.

This case was argued sometime after that against Noble, but we see no reason to depart from the conclusions to which we arrived in that case and we refer to the opinion delivered in that case for our reasons for the decision made herein.

Judgment affirmed.


NOTE.—The question raised in these cases, affecting a business of increasing magnitude, have elicited so much attention, not only here but in different sections of the Union, that the reporter has determined to make room for valuable papers relating to the matter, which might otherwise be inaccessible. The space is spared with less reluctance, because having been produced upon the hearing either in this court or the Court of Appeals, they form a part of the argument of the respective counsel, and bear with weight upon a discussion which promises to continue in some form until ultimately settled by the Supreme Court of the United States.

The papers referred to consist of the opinions of DANIEL WEBSTER, of Massachusetts, SAMUEL JONES and GEORGE WOOD of New York, and MARK SKINNER of Illinois; to which are added an opinion of WILLIAM L. DAYTON of New Jersey, and the points of the eminent counsel, WILLIAM CURTIS NOYES and JOHN H. REYNOLDS, by whom this case has recently been argued in the Court of Appeals.

*William Curtis Noyes*, for the defendants, Wright and others, made and argued the following points:

I. The act in question requires the agent of every "individual, or association of individuals," not incorporated by the laws of this state,

1. To pay to the treasurer of a private corporation, two dollars upon every hundred of all premiums of insurance made or agreed to be made in the city of New York, during each year. (Laws 1849, ch. 178.)

2. Forbids any person from acting as agent for such "individual or association of individuals," until he executes a bond, with sureties, that he will do so.

3. It imposes a penalty of $1,000 upon the agent who shall "effect, agree to effect, promise, or procure any insurance," without having given such bond. (Laws 1849, ch. 178, § 3.)

4. It requires him to report to the comptroller of the state, and to the treasurer of the fire department of the city, once in each year, and as often as he shall change his place of doing business, the street and number of the street where his business is carried on, "designating in such report the individual or individuals, and association or associations, for which he may be such agent or otherwise," under a like penalty of one thousand dollars. (Ibid. § 4.)

II. The business of insurance, where the contracts are not those known as "wager or gaming" policies, is perfectly lawful at common law, and may be carried on in this state by any individual, for himself or as agent of another, whether a citizen of this state or not, or by any foreign corporation, they not being alien enemies. (1. Phil. on Ins. §§ 146, 147, 167; 2 R. S. 662, §§ 8, 9, 10.)

III. The act in question, so far as it requires the bond to be given, and the two per cent. to be paid by this agent of any individual, is unconstitutional and void, because,

1. It restrains any individual, being a citizen of this state, from engaging in a perfectly lawful business in the city of New York as the agent of another individual, whether he be a citizen of this state or not, while the principal himself is at liberty to engage in it if he conducts it in person.

2. Such a restraint upon the agent, as it requires him to pay

the two per cent. specified, is a violation of that clause of the constitution of this state which declares that " private property shall not be taken for public use (if this be a public use) without compensation." (Cons. of N. Y. Art. I. § 6.)

3. But it is not a public use, and is therefore a violation of the fundamental principle which is above all written constitutions, that private property cannot be taken for private use upon any pretext whatever. The legislative act which directs it is not a law, but a judgment or sentence, is a violation of the written provision of the same sixth section, which declares that " no person shall be deprived of life, liberty, or property, without due process of law," and is therefore void. (*Taylor* v. *Porter*, 4 Hill, 140, 4, 5 ; *Wynehamer* v. *People*, 3 Kern. 387, 390, (per Comstock, J.) ; Martin, ex parte, 13 Ark. (8 Eng.) R. 198 ; *Hall* v. *Boyd*, 14 Georgia R. 1 ; *Sharpless* v. *Mayor of Philadelphia*, 21 Penn. R. 147.)

4. It is not a public use, because, First, It is given to a private corporation for its own private uses ; the corporators being a select body of individuals, governing the corporation alone, through trustees selected by themselves, and neither the public nor any one in its behalf having any voice in, or control over, their conduct or the funds given to them. They are not even required to devote them to the purposes mentioned in the act. (Laws 1798, ch. 40, §§ 3, 6.) The plaintiffs are a corporation in the city of New York under the laws of 1798. (XL. Andrew's Laws, p. 332, and Davies' Laws relative to the city of New York, p. 392.) By section six of their act of incorporation, they are authorized to apply their funds to " the relief of such indigent and disabled firemen, and their families, as may be interested therein, and who may, in the opinion of a majority of the trustees, be worthy of assistance ;" but if the funds are greater than may be deemed necessary, the surplus may be applied to the purpose of extinguishing fires, "under such restrictions and limitations as they may, with the sanction of the corporation of the city of New York, deem proper." Second, By the well settled general rule, such a corporation, though created for a purpose apparently benevolent, is a mere private

The Fire Department *v.* Wright.

corporation, and has in no legal sense a public character. (Angel and A. on Corp. 5th ed. §§ 34, 35, 36.)

5. It is also a violation of another section of the same article, which declares, " that no member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." This provision secures to each citizen an equality of rights with every other ; and the legislature has no power to discriminate, and to take a sum of money from one for engaging in a business which others may pursue without any restriction whatever. ( *Wynehamer* v. *People*, 3 Kern, 392–3 (per Comstock, J.) ; ibid. p. 416 to 421 (per A. S. Johnson, J.)

IV. But regarding the act as taking the two per cent. from an individual, a citizen of another state, and giving it to this private corporation for a private purpose, then it is a violation of that provision of the constitution of the United States which declares, that " the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." (Con. U. S. Art. IV. § 2, subd. 1.)

1. Any citizen of New York may engage as principal in the business of insurance without having two per cent. of his earnings taken from him under this or any other law.

2. But a citizen of another state may not, the legislature having made an unjust discrimination against him, in defiance of this provision of the constitution.

3. It is a violation of this provision to impose burdens upon citizens of another state which are not imposed upon our own, whether it be in the form of a tax or otherwise.

In *Corfield* v. *Congell*, 4 Wash. C. C. R. 381, Washington, J., speaking upon this subject, said, " The right of a citizen of one state to pass through or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise, to claim the benefit of the writ of *habeas corpus*, to institute and maintain actions of every kind in the courts of the state, to take, hold, and dispose of property, either real or personal, and an exemption from higher taxes or impositions than are paid by the other citizens of the state, may be mentioned as

some of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed fundamental," etc.

In *Crandall* v. *The State*, 10 Conn. R. 343, Daggett, Ch. J., said, "The plain and obvious meaning of this provision is to secure to the citizens of the states the same privileges as are secured to our own, by our own state laws.

"Should a citizen of Connecticut purchase a farm in Massachusetts, and the legislature of Massachusetts tax the owner of that farm four times as much as they would tax a citizen of Massachusetts, because the one resided in Connecticut and the other in Massachusetts ; or should a law be passed by either of those states, that no citizen of the other should reside or trade in that other, this would undoubtedly be an unconstitutional law, and should be so declared." (3 Story on Con. ch. 40, p. 643, §§ 1798 to 1801 ; Art. IV. of Confederation U. S.)

In *Wiley* v. *Parner*, 14 Ala. R. 627, it is decided that an act of the legislature of that state, taxing the slaves of non-residents higher than those of resident citizens, was contrary to the constitution of the United States, and void for the excess. (*People* v. *Naglee*, 1 California R. 242.)

V. Regarding it in this light also, and the money as being applied to a public use, it is also a violation of that part of the fifth amendment of the constitution of the United States, which is in these words : "Nor shall private property be taken for public use, without just compensation." But it is not a public use, as has been already shown, but a mere private one, and forbidden as well under the constitution as without it.

VI. The taking of the two per cent. from agents only, and giving it to a private corporation, cannot be justified as an exercise of the power of taxation, because—

1. It is entirely unequal in its effect, and operates only upon a certain class of persons engaged in the business of insurance, namely, resident agents or foreign individuals, citizens of other states, and does not affect individual resident insurers or insurance companies of this state. It is not, therefore, a tax upon the business, but upon a certain class of those engaged in it,

and as to agents, those who, upon principle, should be the last persons to be taxed.

2. "Taxation exacts money or services from individuals as and for their respective shares of contribution to any public burden" (per Ruggles, Ch. J. in *People* v. *Mayor of Brooklyn*, 4 Coms. 425), "and operates upon a community or class of persons by some rule of apportionment." (Ib.) This does no such thing; it only affects portions of a class of persons engaged in the same calling, and instead of collecting or applying the money exacted to any public burden, or as their shares in any such public burden, it gives it to a private corporation for its own uses, not to a public purpose. That it may possibly go to a private charitable purpose can make no difference; for the support of the "indigent or disabled firemen" is not a public use any more than that of "indigent or disabled" persons of any other class.

3. Although it has been decided in several cases that the legislature may tax a particular calling or business, yet in every instance the tax has been imposed for a public purpose, and the proceeds of the tax applied to such purpose by the state authorities, or by a local municipality exercising, for purposes of government, a portion of the legislative power. (*Nathan* v. *State of Louisiana*, 8 How. U. S. R. 93; *Austin* v. *The State*, 10 Missouri R. 593; *Simons* v. *Same*, 12 ib. 268; *Stevens* v. *Same*, 2 Ark. R. 298; *Commonwealth* v. *Milton*, *City of Lexington* v. *Same*, 12 B. Mon. 213; *Takern* v. *Wright*, 3 Zab. R. 429.)

4. It is so also with our own tax upon goods sold at auction. The whole business is taxed, and the proceeds of the tax paid into the state treasury for public purposes. (1 R. S. 529, § 32; Laws 1843, chap. 86.)

5. So all excise money for tavern and grocers' licenses under the Revised Statutes, were paid over to the county treasury for the support of the poor. (1 R. S. 678, 682, § 31.)

6. It is believed that no statute exists taking a sum of money from one person or class of persons, and giving it to a private

corporation of any sort, nor any laying a tax and then making such a disposition of it, except the act in question.

7. It is, then, in effect, an act levying a contribution for a mere private purpose, or for a purpose in which, though it be partially public, those from whom it is exacted have no interest; and, as such, it is not a law, but a sentence commanding the periodical payment of a sum of money by one portion of a class of persons to another, and is void. (*Sharpless* v. *Mayor of Philadelphia*, 21 Penn. 148.)

8. In all cases of taxation, the law contemplates a compensation to the party upon whom the tax is levied, as well as where property is taken under the right of eminent domain; the compensation in the case of taxation being the benefit derived by the tax payer in the greater security of his property, and the other advantages flowing from good government.

VII. But regarding the act and its instructions as affecting insurance companies of a sister state only, and as compelling their agents to give a bond to pay, and requiring them to pay annually, to this private corporation, for its private use, a portion of the premiums earned by them in a laudable and lawful business, it is also unconstitutional and void:

1. A domestic corporation, created to carry on the business of insurance, is a citizen of this state; entitled, as such, to all the rights of such a citizen, which, from the character of its existence as an artificial being, relate entirely to its franchises and property. (*Louisville Railroad Company* v. *Letson*, 2 How. U. S. R. 497; *Marshall* v. *Baltimore and Ohio Railroad Company*, 16 ib. 314; *The Bellona Case*, 3 Bland. 451–2; *Nabob of Arcott* v. *East India Company*, 3 Brown C. C. 303; A. and A. on Cor. 5th ed. § 467; *Conroe* v. *National Protection Insurance Company*, 10 How. Pr. R. 403.)

2. As such citizen, and in respect of its franchises and property, it is also a person, and, as such, entitled to all the rights of such a person. (2 R. S. 703, § 35; *People* v. *Utica Insurance Company*, 15 J. R. 359; *Mott* v. *Hicks*, 1 Cow. 513; *State of Indiana* v. *Woram*, 5 Hill, 33, 38; *Boyd* v. *Craydon*

*R. W. Company*, 4 Bing. N. C. 669; *United States* v. *Amedy*, 11 Wheat. 392.)

3. They are also inhabitants of the state under whose laws they are created, and in which they have their office and carry on their business. (*Ontario Bank* v. *Bunnell*, 10 Wend. 186; *Sherwood* v. *Saratoga and Washington Railroad Company*, 15 Barb. 650.)

4. As the owner of its property, such a corporation is entitled to the same protection as any individual citizen; and its private property can only be taken for public or private use in the same manner and under the same circumstances as the private property of an individual. (*The Bellona Case*, 3 Bland. 451-2.)

5. A corporation of a sister state has precisely the same rights as those above enumerated, in the state which created it, and where it transacts its business.

6. The constitution of the United States recognizes all the corporations created by the several states, as citizens and persons, not only in the states which created them, but in all other states where they transact business; and this, not only for the protection of their property, but for the enforcement of their rights by action in the federal courts, in which, by the constitution (so far as this question is concerned), citizens alone are authorized to sue. (Cases under point vii. sub. 1; *Bank of Augusta* v. *Ezle*, 13 Peters, 519, 588, per Chief Justice Taney.)

7. So the several states, under the comity of nations, enlarged and liberally applied from the character of our confederated Union, recognize the corporations of sister states, as citizens of the state in which they are created, and as persons authorized to contract, to hold property, and to sue in their own courts. (Cases under last subd. and *Silver Lake Bank* v. *Nath*, 4 John. Ch. R. 370.)

8. There are, then, under the constitution of the United States, two classes of citizens who are entitled to its protection, and to all the rights secured by it, viz. natural persons and corporations; and its provisions may be invoked by each

whenever the rights of either are invaded in violation of its letter or spirit.

9. Being a citizen of another state, and a person capable of holding and conveying property, it is not in the power of the legislature of a state in which its property may be, but in which it was not created, to forbid its holding or conveying it, or suing for its recovery. As a citizen or person, its rights of property are under the same protection as the state and federal constitutions, as those of an individual or natural citizen. It is conceived that, as to all its rights of property, this cannot be denied.

10. It clearly is entitled, under the constitution of the United States, to the same protection, in respect to its rights of property, as similar corporations (or citizens) of the state where the property may be situated. If it be not so, each state may (but for restrictions in its own constitution) confiscate or otherwise appropriate to itself or to any other use, all the property of corporations created by the other states, which may happen to be within its limits.

11. It follows, therefore, that under that clause of the constitution of the United States, already quoted, declaring, " that the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states," a corporation created by and being a citizen of one state, is entitled in each state to all the " privileges and immunities " of similar citizens of that state; provided its charter authorizes the exercise of such privileges and immunities. If this clause protects a natural person who is a citizen, it also protects an artificial person who is also a citizen under the constitution; so that one state cannot put its own artificial citizens upon any better footing than a like citizen of another state, or make any unjust discrimination between them to the prejudice of such citizen of another state. ( Vide Mr. Webster's opinion.)

12. In the case of Bard v. Poole (2 Kernan, 495), which seems to decide contrary to the last proposition, the point was not much argued; indeed, it seems to have been cancelled; nor does it appear to have been much contested in the cases

cited in the opinion. Besides, it was not essential to the discussion, and cannot, therefore, be deemed a binding authority. Upon admitted principles of comity, the corporation in that case not being forbidden to loan money in this state, its contract securing the loan was lawful.

13. Nor do any of the cases which have been decided upon similar acts in other states determine this precise question; for they not only arose upon laws essentially different in their provisions, but the attempt was generally to resemble the rights of corporations as citizens to those of natural persons as citizens; which the courts did not recognize. (*Commonwealth* v. *Milton*, and *City of Lexington* v. *Same*, 12 B. Mon. 213; *People* v. *Thurber*, 13 Illi. R. 554; *Tatem* v. *Wright*, 3 Zabr. R. 429; *People* v. *Imlay*, 20 Barb. S. C. R. 68; *Warren M. Company* v. *Ætna Insurance Company*, 2 Paine's C. C. R. 516.)

14. But, however this may be, this act takes the private property of a citizen corporation of another state and gives it to a private and local citizen corporation of this state; thus taking the private property of one citizen and giving it to another, and this without any compensation, just or otherwise; and it is, therefore, a violation of both the state and federal constitutions, which forbid this being done.

15. And, regarding this as affecting the corporation alone, it has been already shown under point vi. that it is not justified as an exercise of the taxing power.

16. But, conceding that it is an exercise of the taxing power, then the act in question violates §§ 8 and 13 of the constitution of New York, Art. VII.; as, being a tax, it is part of the "funds" of the state, or under its management, and the proceeds are given directly to a private corporation. Without any specific appropriation, and without distinctly specifying the sum appropriated, and by reference to another act (that of 1798), for the "object" to which it is appropriated; and is also indefinite in duration, not being limited to two years, as by these sections is required.

VII. In every aspect of the case the taking of the property in question and giving it to a private corporation is a violation

of that clause of the constitution, mentioned in Judge Skinner's opinion, which is adopted as part of these points.

VIII. But if the court should be of opinion that this state had a right, by virtue of any act of the legislature, to compel the giving of the bond and the payment of two per cent. by a corporation of another state for the privilege of carrying on the business of insurance within its limits, still, as the act also required and the bond compelled the defendant to pay a like sum upon all insurances made or agreed to be made for individuals, and as it has been shown that, in this respect, the act is unconstitutional and the bond illegal, it is illegal and void *in toto*, and cannot be enforced. The judgment should, therefore, be reversed.

*John H. Reynolds*, for the plaintiffs, The Fire Department, made and argued the following points:

I. The statute under which the bond was given, does not in any respect contravene the section of the constitution of the United States, which provides that "the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states." (Const. of the U. S. Art. IV. § 2, subd. 1.)

1. The act imposes no burden upon the citizens of other states that it does not equally impose upon the citizens of the state of New York. It applies to "every person who shall act in the city and county of New York, as agent for or on behalf of any individual or association of individuals, not incorporated by the laws of this state, to effect insurances against loss or injury by fire in the city and county of New York, although such individuals or association may be incorporated for that purpose by any other state or country."

2. The effect of the act is to levy a tax upon every insurer doing business in New York, whether a citizen of New York or not, unless incorporated by the laws of the state of New York. It applies equally to citizens of every state, who may engage in the business of insurance in the city of New York, and excepts none unless incorporated by our laws.

The Fire Department *v.* Wright.

3. It cannot be doubted but that the citizens of the state of New York are subject to this act, and if so, the argument of the defence goes the length of claiming greater privileges and immunities for the citizens of other states, than are granted to our own. (*Frost* v. *Brislin*, 19 Wend. 11, 15 ; *Livingston* v. *Van Ingen*, 9 J. R. 577.)

II. So far as this act operates to prohibit foreign corporations from conducting the business of insurance in this state, except subject to the payment of the tax, it is not objectionable, even if they are not put upon equal terms with corporations created by and existing under the laws of this state.

1. Because a corporation is not a " citizen," within the meaning of the constitution, and is not entitled to the immunities and privileges of citizens in the several states. (1 Bouvier Law Dic. 249, 250 ; *Bond* v. *Poole*, 2 Kernan, 504.) 2. It has no legal existence beyond the territorial limits of the sovereignty by which it is created. It can not migrate and dwell beyond the jurisdiction which gave it legal life. (*Bank of Augusta* v. *Earle*, 13 Peters, 521.) 3. If allowed to make contracts in another state, or sue in foreign courts, it is only by comity or express statute. (13 Peters, *supra;* 2 R. S. 457, §1.) 4. There can be no doubt of the power of our legislature to absolutely prohibit foreign corporations from transacting business in this state. This power has always been exercised, and never questioned. (*Vide* restraining act, 1 R. S. 894, §6 ; *DeGroot* v. *Van Duser,* 20 Wend. 390.) 5. Without this power, the government of our state could scarcely exist. Other states might overwhelm us with banks, insurance companies, and other corporations, without limit, and thus place them beyond the control of our legislature, as to taxation and in every other respect. 6. And if our legislature may prohibit, they may admit such corporations to do business here under such restrictions as they may see fit to impose, and in this respect their power must be unlimited.

III. The power of the legislature to enact the law in question, is not affected by the provision of the constitution of New York, forbidding the taking of private property for public use,

without just compensation. (Const. of N. Y. Art. I. § 6.) It properly belongs to the taxing power of the government. This power exists equally in all the states of the Union, and without it no state could exist. The only exception is that no state can impose duties upon exports or imports. (2 Story on the Constitution, 410; *Gibbons* v. *Ogden*, 9 Wheat. 1, 199 to 202.)

1. The power of taxation existing in a state, in cases where it may be exercised, is almost wholly unrestrained. It is exclusively within legislative discretion, and they may discriminate as to the subject, the object, the class to be taxed, and the district within which it is to be laid, and they have the exclusive power of apportionment. (*The People* v. *The Mayor, &c., of Brooklyn*, 4 Coms. 420, 426, 427; *Hylton* v. *U. S.* 3 Dall. 171; *Biddle* v. *The Commonwealth*, 13 Serg. and R. 405; *Nathan* v. *The State of Louisiana*, 8 How. 733; 1 Kent. Com. 439, note A.; *Dobbins* v. *The Coms. of Erie Co.*, 16 Peters, 447; *Providence Bank* v. *Billings*, 4 ib. 514; *Mager* v. *Grima*, 8 How. R. 490; *Cooley* v. *Board of Wardens*, 12 How. 299; *The City of New York* v. *Miln*, 11 Peters, 102; *McCullock* v. *State of Maryland*, 4 Wheat. 428.)

2. It is undeniable that the legislature may tax all corporations, or any particular class, and they may tax all unincorporated associations, or any particular class, as those who insure against fire. (4 Coms. *supra*.)

3. And if the tax may be imposed, the manner of its collection, and the object to which, when collected, it shall be applied, is wholly within their control. (3 Kernan, 143, 149.)

4. A tax is a burden, charge or imposition, put or set upon persons or property for public uses. (*Matter of Mayor of New York*, 11 J. R. 77, 80.)

5. The tax payer receives, or is supposed to receive, his just compensation in the protection which government affords to his life, liberty and property, and in the increase of value of his possessions, by the use to which the government applies the money raised by the tax, and all taxation operates upon a community, or upon some class of persons in a community, and by some rule of apportionment. (4 Coms. 422, 424.)

The Fire Department *v.* Wright.

6. A tax may be raised for the support of schools, hospitals, asylums, or any charity. All these are public uses. All these taxes may be raised by a law which specifies the object to which they are to be appropriated. (*Thomas* v. *Leland*, 24 Wend. 65.)

7. If the tax may be lawfully levied, the legislature may prescribe the mode of its collection, and there can be no valid objection to making the person or institution for whose benefit the tax is levied, the collector of the tax. First, This method of collection is frequently adopted in our statutes. (1 R. S. 445, § 7, p. 678, § 4, p. 683, § 31, Laws of 1839, p. 11.) Second, And the passenger act of 1845, was not objected to on this ground. It was held invalid for other reasons. (*Smith* v. *Turner*, 7 How. 283.) Third, The tolls paid on turnpikes or toll bridges are but " delegated taxes." It would be the same in legal effect, if in place of a toll, the law authorized a direct tax for the road or bridge, and made the road or bridge company the collector. (4 Coms. 431.)

8. A very small proportion of the taxes annually levied, are paid into the state treasury. They are collected by the collectors and paid directly to town officers or persons having claims against the town, and to sundry officers in cities, and by them disbursed. (1 R. S. 453, § 13, 3d ed.)

9. The legislature annually appropriates moneys raised by tax for the support of government, to public charities. The Fire Department is a public charity, established for the benefit of indigent and disabled firemen and their families. (See act passed March 20, 1798.)

10. And if the equity of the case is to be regarded, there is no more appropriate source from which to draw this tax for the benefit of disabled firemen, than from those who make profit by dealing in insurance. They receive in fact the benefit of the service of the firemen, and if disabled while in service it is entirely equitable, that the insurance companies should be taxed for their benefit. They have in a great degree the benefit, and they cannot reasonably object to bear the burden.

IV. The power exercised by the legislature in passing the act in question, is maintainable upon the same ground, upon

which an infinite variety of legislation is sustained, absolutely essential to the existence of the government.

It involves a regulation purely internal, and is precisely like the regulation of the traffic in ardent spirits, requiring a license fee to be paid, the tax upon hawkers and peddlers, and upon various other pursuits carried on within the limits of the state.

That the state may regulate the business of insurance to be carried on within its territory, cannot be questioned. It may require a tax to be paid by those who engage in it, and every person may engage in it under the restrictions imposed or not, as they please. There is no compulsion. If they do not choose to engage in the business, they are relieved from the payment of the charge. In this there is nothing bearing any resemblance to the taking of private property for public or private uses, within the meaning of the constitution. The judgment should be affirmed.

OPINION OF JUDGE SKINNER, OF CHICAGO, FORMERLY OF THE ILLINOIS SUPREME COURT, AGAINST THE CONSTITUTIONALITY OF A SIMILAR STATUTE.

I am asked whether the 6th, 7th, 8th, and 9th sections of the act to incorporate "The Firemen's Benevolent Association of the City of Chicago," passed June 21st, 1852, are constitutional and binding.

Our state constitution contains a provision common to all the state constitutions of our sister states, that "no freeman shall in any manner be deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land."

The meaning and effect of this provision has been frequently adjudicated, and is now thoroughly understood. So far as it relates to the right of property, it absolutely prohibits the legislature from passing any laws the effect of which would be to dispossess any man of any portion of his property, excepting when the same may be required for public purposes or in the administration of justice. By other clauses of the constitution

The Fire Department *v.* Wright.

the power of the legislature to pass laws the effect of which is to seize and appropriate the private property of individuals for public purposes, whether by forcible seizure or by taxation, is limited and guarded.

The clause above quoted, whilst contemplating and virtually authorizing the passage of such laws as may be necessary for the due administration of justice, effectually inhibits the legislature from passing any laws which would have the effect to deprive any person of any portion of his property in any case, or for any purpose, not warranted by other clauses of the constitution.

A careful examination of the constitution shows that the legislature cannot pass laws whereby a man may be deprived of any portion of his property, excepting as follows:

1st. Laws authorizing the appropriation of any specific portion of a man's property for public purposes, but for no other, upon first making him due and just compensation therefor.

2d. Laws providing for the appropriation of the property of individuals in the course of a due administration of justice.

3d. Laws passed in pursuance of the power of taxation vested in the legislature, as limited and restricted by the provisions of the constitution.

That the provisions of the act in question come under either the first or second of these heads, will not of course be pretended. It only remains therefore to inquire whether the legislature, under its power of taxation, has the constitutional right to pass such a law as the one under consideration.

Without undertaking to define or enumerate what is actually within the legislative power of taxation, it is sufficient for the present purpose to lay down the clear and undisputed principle that the right to take the private property of one person and give it to another private person, for his private use, is not within the power of taxation or any other power possessed by the legislature. The legislature may compel a man to part with any specific article of property to be appropriated to public purposes, upon making him due compensation. It may compel him to yield up his property for the payment of his

debts, or as a penalty for wrong doing. It may compel him to appropriate a portion of his estate in paying his proportion of the burden of government. But it has no power to compel him to alienate any portion of his property to a private person for private uses, even though he should receive tenfold compensation; much less can it compel him to part with his property for such purpose without any compensation whatever.

There is no way in which a law can be disguised, whether under the name of a license law, revenue law, or how otherwise, that can effect such an object directly or indirectly, or that can baptize it into a constitutional and vital existence.

Does the act in question attempt the accomplishment of any such result? By the terms of the first five sections of the act in question, a private corporation is created. It is simply a private corporation; a purely private, artificial person, created by law for a private purpose, and without one trace of any thing of a public nature in its composition, and without one public duty. As such private person it has only the bare naked rights of an ordinary private person, not to the extent by any means of a natural person, but only such as are allowed to it by the bare letter of the charter of its existence. Beyond this it has nothing. The succeeding sections of the act are the ones under consideration. By these the legislature has attempted to require that all persons acting as agents of persons and associations not incorporated by the laws of the state of Illinois in the business of effecting insurance against loss or injury by fire in the city of Chicago, to pay over to the private corporation so created by the preceding sections of the act, two per centum of all premiums received by such agent, or agreed to be paid to him year by year. The provisions in question have just this extent and no more; they require certain private persons pursuing a lawful calling in the city of Chicago to give year by year a portion of their estate without compensation or equivalent to another private person for the private use and benefit of that person alone; and in addition thereto, meanwhile, put such persons under bonds in a heavy sum that they will so give of their estate in compliance with the terms of the law.

The Fire Department *v.* Wright.

The insurance business in the state of Illinois is as legitimate and proper as any other business in which the citizens of the state can embark. It is open alike to all persons, natural as well as artificial, individuals as well as corporations. There is no law prohibiting it—there is none that discountenances it as being a calling hostile or injurious to public policy. The premium money earned in its pursuit as absolutely and as justly belongs to the person or association earning and receiving it, as do the wages of labor belong to the laborer that earns and receives them. Once earned, they become private property, and as such are protected and assured as perfectly as the rights of property protect and assure any private property whatsoever. To compel the owner to part with any portion of property so earned, except in the same manner that the owner of any property legitimately earned in any calling, however worthy or honorably, may be compelled to do, is rank robbery. Under our constitution it cannot be legally done. The act in question, however, attempts to effect that object. It calls upon the insurance agent to pay over a considerable percentage of his employers' property, not as a public and equal tax levied on community at large, or even on all persons of his craft, to go into the public treasury for the public good; not in the course of the administration of justice to pay just debts or recompense a wrong—but simply, nakedly, and boldly as a forced gratuity, without compensation or equivalent, to a private person for private benefit. The fact that the corporation is ostensibly created for a charitable purpose, of course does not affect the position in any particular. It is in no sense a public corporation, much less a political one, in the sense in which city and town corporations are; and cannot, therefore, claim any such rights or powers as are sometimes granted to such corporations. It is purely private, both in its constitution and the ends for which it was created; and all its rights and powers therefore are, and must be, upon the narrowest and most restricted basis.

But it may be attempted to be argued that this money so required to be paid is not a tax, but is license money. I have

never been able to apprehend the difference attempted to be drawn between taxes and licenses, as also between taxes and special assessments. A tax on property may be one thing, and a license to pursue a particular calling may be a different thing; but I apprehend it involves a difference in name and not in nature. In either case it is simply the exercise of that power of taxation inherent in the state by which the public wrests from a man a portion of his private property without compensation, for the purpose of supporting the government. The change of name from tax to license does not change the act. But, whether it does or not, it is not necessary on the present occasion to inquire. The act in question is not in any sense whatever a license law. A license law comprehends only the idea of paying into the public treasury for the public benefit whatever amount of money the law may see fit to exact of any one pursuing a particular calling. The 2d section of the 9th article of our constitution expressly defines what callings, business, and persons may be specially taxed, and thereby, according to well understood construction of statutes, limits the callings, business, and persons that may be so taxed, and also the method of taxing them. By this clause the legislature is restrained from imposing any other burdens upon the business, employments, and persons there enumerated, except by way of taxes. Call it license or what you will, it is still only a tax, and must have all the features and characteristics of taxation. It must be imposed for the public benefit, and its proceeds must be applied for the public good and not for any private benefit. The badges which distinguish a valid tax, even though it be called a license, are—that it is uniform, equal, and that the proceeds go into the public treasury. That treasury may be the state, county or town; but still it is the public treasury, and the money must go into them, and, ostensibly at least, for the public benefit. The license must be uniform—that is, alike in its character and equally imperative on all of the particular class of persons pursuing the calling to be licensed. It must be equal in its burden, though that equality may be *per capita* or a percentage. And in all cases

the money received must go into the public treasury for public purposes.

The decision in the case of *The People* v. *Philip Thurber*, 13th Illinois, 554, cannot be cited to sustain the provisions of the act in question. The license law under which that decision was rendered was passed during the lifetime of the old constitution, and before the limitation afterwards made in the 2d section of the 9th article of the new constitution took effect. The new constitution kept the license law alive, and therefore the case was adjudicated without any reference to the implied limitation in the new constitution. And even if it had been it would have made no difference; for that was a case of real, *bonâ fide* license, when the money went into the public treasury, and was raised equally and with due regard to the legitimate rules of taxation.

It may be thought that this law only affects the agents of foreign companies, persons, or associations. But this is not so. Every person, partnership, or association residing in the state of Illinois, and even in the city of Chicago, that underwrites through an agent in the city of Chicago, and insures property here against loss or damage by fire, is amenable to these provisions if they are constitutional and binding. In this way private persons are heavily taxed for doing a lawful business, while artificial persons escape. The law, therefore, is unequal, and does not bear equally and justly on the class of persons within the purview of its spirit. This fact, too, destroys all the pertinency of any argument that might be attempted to be predicated upon the right of the state to regulate the use and enjoyment of franchises or privileges in this state, by foreign corporations or persons.

The provisions of the act in question seem to belong exclusively and solely to that rare class of statutes by which it is attempted to benefit one person at the expense of another. If there was ever a case in which the descriptive language of the greatest of American lawyers could be made to properly and pertinently apply, this is one; for in truth and in fact the act

in question is "a legislative judgment; an act directly trans-
ferring one man's estate to another."

For these reasons I consider the law unconstitutional, and
therefore void.

MARK SKINNER.

*February 23d,* 1856.

OPINION OF DANIEL WEBSTER, QUESTIONING THE VALIDITY OF THE
NEW YORK ENACTMENTS.

We have examined an act of the legislature of New York,
concerning marine insurance, and the law relating to insurance
on property made in foreign countries, to which the first men-
tioned act refers.

We are not certain that we understand the joint effect of
these two acts.  The 3d and 4th sections of the last mentioned
act are as follows :  " There shall be paid into the treasury of
this state, on the first day of February of each year, by any per-
son who shall act as agent for any individuals, not incorporated
and authorized by the law of this state, to effect insurances
against losses by fire, although such individuals or associations
may be incorporated for that purpose by any other state, the
sum of ten dollars upon the one hundred dollars, and at
that rate upon the amount of all premiums which, during the
year ending on the preceding first day of September, shall have
been received by such agent, or any other person *for him,* or
shall have been agreed to be paid, for any insurance effected
or agreed to be effected or procured by him as such agent
against loss or injury by fire."

The 5th section then proceeds to impose penalties for the vio-
lation of the preceding provisions.

Then the act of May 1st, 1829, says, " All the provisions of
title 21st of chap. 20 of the first part of the Revised Statutes
respecting insurances on property in this state made in foreign
countries, and by individuals and associations unauthorized by
law, and all the prohibitions, requirements, and penalties
therein contained, are hereby extended and applied to contracts
of insurance, or by way of insurance, against marine losses and

risks, or by lending money on respondentia or bottomry, and to all persons, associations, or companies, and agents of the same, making, effecting, or procuring any such insurance or contracts by way of insurance or loan, or any other business which marine insurance companies incorporated by the laws of this state, may or do transact by virtue of their respective acts of incorporation."

We do not understand that it is unlawful in New York for citizens of that state, by themselves or agents, to enter into contracts of insurance either against fire or marine risks, either by themselves or their agents; and suppose no such prohibition was intended.

Taking the two acts together, we consider their effect to be, that although individual citizens severally, or any number of individuals jointly, being citizens of New York, and residing in that state, may make insurance contracts either personally or by agents, without being subject to any penalty or tax, yet that citizens of Massachusetts, as individuals or associated as parties or incorporated, although allowed to make such contracts, and to have them considered as binding and valid, are yet made subject to the state for the payment of ten per cent. on the amount of premium.

The opinion we give is founded upon this understanding of the effect of the two statutes. If we have misapplied the legislative provisions in this respect, that opinion of course sits on an erroneous basis. The question then proposed to us is, whether the said act is good and valid, so far as it respects contracts of insurance made by individuals, citizens of Massachusetts, and residing in Massachusetts, through the instrumentality of an agent residing in the city of New York: this is, we think, the true question.

It is a grave matter for us, doubtless, to question the constitutional validity of the deliberate acts of the legislature of New York. Its wisdom and its ability to judge correctly of the just extent of its powers, we surely cannot doubt. It is possible, however, that acts prompted, as this may have been, by individual or local interests and speculations, may have passed

through the legislature without its bringing into view considerations which are in some degree remote. We confess, however, that with all diffidence and respect for those who have enacted the law, if its purport and effect be as we have above supposed, it does appear to us doubtful whether it be not repugnant to the constitution of the United States.

The second section of the third article says, " The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." In looking for the intention of the framers of the constitution in this clause, it is useful to refer to the corresponding provision in the then existing articles of confederation.

That provision is in the following words : . " The better to secure and perpetuate mutual friendship and intercourse among the people of the different states in this Union, the free inhabitants of these states, paupers, vagabonds, and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens in the several states ; and the people of each state shall have free ingress and egress to and from any other state, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions, and restrictions, as the inhabitants thereof respectively, provided that such restrictions shall not extend so far as to prevent the removal of property imported into any state to any other state of which the owner is an inhabitant," etc.

Now, we think that the law of New York would, if the articles of confederation had continued part of the supreme law of the land, have been repugnant to the last clause in that provision. This clause, however, it appears to us, introduced nothing new, nothing that was not comprehended under the previous words of the provision. It is, we think, merely a particular enumeration of what had been before set forth in general terms. We take the meaning of the provision to be this. The inhabitants of each of the states shall expect and be entitled to all privileges and immunities, to the right of free ingress and egress, and the enjoyment of the privileges of trade and commerce, subject to the same duties, etc.

The Fire Department *v.* Wright.

The right of carrying on trade in a different state on the same terms with the citizens of that state, being a very important privilege and immunity, is for a greater certainty particularized. We so understand this provision. Now, the framers of the constitution, in introducing any provision into it, would naturally keep their eyes fixed on the corresponding provision, if such provision there was, in the old articles of confederation. This corresponding provision they would, if bad, amend or essentially alter, and if good, retain ; if encumbered with unnecessary words, retrench. They probably took up the provision just quoted, and after remedying the ambiguity growing out of the terms " free inhabitants," " people and citizens," then thinking, as is most likely, the latter part of the old provision to be useless, as being previously embraced by the previous words, retrenched the residue of the paragraph. The clause in the constitution is, we think, nothing more than the old provision compressed, and its makers' thoughts simplified. Any law that would have been repugnant to the one is, as it appears to us, repugnant to the other. What tends exceedingly to strengthen this conclusion in our minds, is the great difficulty we find in believing that it was the intention of the framers of the constitution to weaken in this respect the bonds of national union, or to render the citizens of the different states more alien to each other than they were under the confederation, which is so entirely obvious that the general end and object of the constitution were to unite the people of the different states more friendly together, to give them something more of a national character, and especially to put all matters of trade and commerce on one uniform footing throughout the United States. We admit freely that the clause in question must be subject to some exceptions to its terms from the nature of the case and from other constitutional provisions ; political and municipal privileges, for example, as they are to be enjoyed only upon condition of residence within the state, cannot be meant to be conferred upon citizens of other states ; and there may be other exceptions, and equally clear. Still, we find it difficult to persuade ourselves that the clause did not intend something more

than the mere ability of the citizen of one state to become a citizen of another by removing to it and residing therein. And if anything beyond this mere faculty of becoming a citizen was intended by the clause, we think the right of carrying on trade and commerce with the same advantage as citizens is one of the privileges and immunities which the clause confers.

In the case of *Corfield* v. *Coryell*, in the Circuit Court of New Jersey, Mr. F. Washington, in commenting on this part of the constitution, says, " The inquiry is, what are the privileges and immunities of citizens in the several states? What these fundamental privileges are, it would perhaps be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: protection by the general government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject, nevertheless, to such restrictions as the government may justly prescribe for the general good of the whole. The right of a citizen of one state to go through or reside in another state, for the purpose of trade, agriculture, professional pursuits, or otherwise, to claim the benefit of the writ of *habeas corpus*, to institute and maintain actions of any kind in the courts of the state, to take, hold, or dispose of property, either real or personal, and an exemption from higher taxes and impositions than are paid by other citizens of the state, may be mentioned as some of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental." It will be seen that the enumeration of the learned judge embraces this case.

It becomes us to repeat the expression of the diffidence with which this opinion is given; and we feel still greater diffidence in advising the gentlemen concerned what course to pursue under all the circumstances of the case. The New York courts may very probably come to the conclusion different from our opinion; and the process of revising such judgment is dilatory and expensive. It strikes us, however, as being desirable, that measures should be taken to invite the attention of the legisla-

ture of New York to a consideration of the law; upon the expediency of which, as introducing or countenancing a retaliatory system of legislation on commercial subjects between two great commercial states, both important members of the federal union, it is not our professional duty to give any opinion.

Signed,   DANIEL WEBSTER.

### OPINION OF GEORGE WOOD OF NEW YORK, CONCURRING WITH MR. WEBSTER.

I have examined the act in the first Revised Statutes, p. 714. The third section of that act imposes a tax upon any individual or association not incorporated by the laws of this state, though incorporated in any other state, of ten per cent. on premiums for effecting insurances. The design of this act was unquestionably to prevent corporations in the sister states from doing the business of insurance in this state otherwise than by the imposition of onerous restrictions, which should cause them to transact such business to great disadvantage, and prevent them from coming into any competition with New York corporations.

The act of 1837 reduces the tax from ten to two per cent., but the principle is the same.

I think this provision is unconstitutional. It is a tax on business. The legislature no doubt have a right to impose such a tax. They may select such subjects for taxation as they may deem best fitted to bear the burden. But I presume it will not be contended that the legislature can make invidious distinctions between individuals or classes in imposing a tax on property in any branch of business. They could not, for instance, enact that merchants who should underwrite, should pay such a tax on the amount of their premiums, and that mechanics should be exempt from it, or *vice versâ.*

The raising of a tax is the taking of private property for public use. When a tax is general, every individual taxed, receives a just compensation or equivalent in the protection he derives from government. But if invidious distinctions

should be drawn in taxation, in reference to the same subjects of taxation, every one must perceive and feel that there is the absence of just compensation. I can perceive no substantial distinction between the attempt in the present case to discriminate between corporations of this state and other states, and a like attempt at discrimination between individuals.

Clearly a state legislature could not impose unequal taxes upon their own citizens, and the citizens of other states doing business in such state. They must all, in this respect, stand upon an equal footing.

The same may be said of corporations. The legislature do not prohibit the citizens of Pennsylvania, incorporated under Pennsylvania laws, from doing the business of insurance in this state. When thus engaged, such Pennsylvania corporation is pursuing a lawful calling. In the pursuit of that business, I think they can be subjected only to the same tax as shall be imposed on a New York corporation.

The citizens of a sister state do not lose their constitutional right to the enjoyment of the same privilege with the citizens of this state in transacting a legitimate business here, merely because they are acting in a corporate capacity.

Signed,         GEORGE WOOD.

*New York, April* 16, 1847.


LETTER FROM DANIEL WEBSTER.

WASHINGTON, APRIL 13, 1847.

D. A. BOKEE, ESQ., DEAR SIR—I have your letter of the 10th inst. I remember to have given such an opinion as you speak of, but have no copy here, nor have I now either the time or the means of drawing up another opinion on the subject.

I remember that my opinion was a good deal founded on or strengthened by a judgment of Mr. Justice Washington in the circuit court of Philadelphia. The question never appeared to me doubtful.

It may, perhaps, be conceded that since corporations are artificial beings, the creation of state statutes are not "citizens,"

a state may, if it so pleases, refuse to such corporations, when created by the law of another state, a right to sue in its courts, but this would be going very far. But to tax business transactions allowed to be conducted in the state when performed by the citizens of other states, while such transactions are untaxed, when occurring between those who are citizens of the state itself, always seemed to me against the constitutional provision. Citizens of Pennsylvania or Massachusetts are found in New York engaged in mercantile transactions, either among themselves or with citizens of New York, giving and receiving promissory notes and bills of exchange. Could the legislature of New York lay a stamp tax on such bills and notes, no such tax being imposed generally upon all bills and notes?

Signed, DANIEL WEBSTER.

OPINION OF CHIEF JUSTICE JONES, AGREEING WITH MR. WEBSTER AND MR. WOOD.

I have perused the opinions of Mr. Webster and Mr. Wood on the subject to which they relate, and I concur with them in opinion, that a tax upon any lawful business within the state, when carried on by citizens of other states, when such transactions are untaxed while carried on by those who are citizens of this state, is unconstitutional; and that the act of the legislature imposing upon individuals or associations not incorporated by the laws of the state, though incorporated in any other state, a tax of two per cent. on the amount of premiums for effecting insurance, cannot be constitutional. The right of the legislature to impose such a tax upon such a business operation, is not questioned, provided the tax so imposed be general, and proportionally equal upon all persons who are engaged in such business transactions. The legislature may for purposes of revenue select such subjects for taxation as they may deem most suitable, and best calculated to effect the object, with the least inconvenience to and pressure upon the community; but they are not warranted in making invidious and injurious distinctions between individuals or classes.

HARVARD LAW SCHOOL LIBRARY.

the imposition of a tax on property in any branch of business. I can see no just or sufficient ground of discrimination between the case of corporations of this state or of any sister state, and that of individuals. A state legislature cannot impose unequal taxes on the citizens of this state and those of other states doing business therein. They must all be placed on the same footing. The same rule appears to me to apply to corporations. A corporation composed of citizens of a sister state engaged in the business of insurance in this state, can be subjected to the same tax only as shall be imposed on a corporate body, created by the legislature of our own state. The citizens of a sister state do not lose the constitutional right to the same privileges in their lawful occupations and business pursuits in this state with our own citizens, merely because they are associated and are acting in a corporate capacity.

Signed,                SAMUEL JONES.

*New York, February* 8, 1850.

ARGUMENT OF WILLIAM L. DAYTON, OF NEW JERSEY, SUSTAINING THE CONSTITUTIONALITY OF A LAW IMPOSING A LIKE TAX, TO BE COLLECTED, HOWEVER, FOR THE USE OF THE STATE. ($a$)

It is understood between counsel that the demurrer presents the single question, whether the act entitled "An act relative to insurance companies," passed April 15, 1845, is constitutional, as applied to this case.

The question upon this law is narrowed down by the fact that the bond on which suit is brought, in this case, is given

---

($a$) The argument of Mr. DAYTON is added to the foregoing opinions, although, unlike them, it is published in a volume within the reach of the profession. It may be found in the report of the case of *Tatem* v. *Wright*, 1 Zabr. N. J. R. p. 429. In that case, the Supreme Court of New Jersey sustained the constitutionality of an act levying a tax upon the agents of foreign insurance companies doing business within the state. Under that statute, the tax was levied for the use of the state itself.—REP.

The Fire Department *v.* Wright.

by the agent of a foreign incorporated company, not by a mere association of individuals.

The single clause of the constitution of the United States with which this law is supposed to conflict, is that which secures to the citizens of each state " like privileges and immunities with the citizens of the several states."   The first point, therefore, to be proved by the defendants is, that an insurance company, incorporated by the laws of the state of Connecticut, is citizen of that state within the meaning of the constitution. It is not denied that, for the purposes of jurisdiction, corporations have been held " quasi citizens," and that, in many cases, the word person has been held to include corporations, they being, in law, artificial persons.

But the word " citizens," as used in the clause of the constitution, is peculiar; it was evidently intended to confer on the citizens of each state a general right of citizenship in the other states.   (3 Story's Com. 475.)

But it can hardly be pretended such general right could be conferred on a corporation, or on an artificial person.   Citizenship, in the sense intended, applies to natural persons only.

The Supreme Court of the United States, in the case of the *Bank of United States* v. *Deveaux, et al.* (5 Cranch, 6), held expressly, that a corporation, as such, was not a citizen within the constitution, and no well considered case can, I think, be found to the contrary.   (3 Story, C. 566, § 168.)   A corporation has no legal existence outside of the sovereignty which creates it.   It exists by virtue of municipal law, and such law operates within the jurisdiction of the law making power only. A corporation of Connecticut is allowed to do business and make contracts within another sovereignty, but that is only from the comity of states or nations, and not from any absolute right. It is a mere privilege founded on an implied assent, which assent may, by special provision, be on terms or absolutely withheld, at the option of the legislative power.   As soon as this is done, the right or privilege founded on comity is gone, and the corporation stands on its legal rights only, and these are within, and not without, the territorial limits of the power

that created it. These principles are settled in *The Bank of Augusta* v. *Earle*, 13 Peters, 586, and in *Runyon* v. *Lessees of Costar, et al.* 14 ib. 122. In the latter case, the question was as to the right of a foreign corporation to hold lands in Pennsylvania; the court held that it must depend on the assent, expressed or implied, of Pennsylvania. If the corporation were a citizen in the eye of the law, it is manifest the court could not have so held; the right would have been secured under the constitution.

In the former case (13 Peters), Chief Justice Taney expressly repudiates the idea that the right of a corporation within a foreign jurisdiction extends to matters of contract. If it were otherwise, it is manifest a state would be deprived of all control over the extent of chartered powers to be exercised within it. If a state may shut out foreign corporations altogether from making contracts, *a fortiori* she may admit them to do so upon terms; the major includes the minor proposition.

This right of distinguishing, even between citizens, is not unfrequently exercised in our courts. In all matters of guardianship, trust, etc., whether of persons or property, the judiciary constantly takes care that such trust does not pass into hands beyond its jurisdiction.

But, again, the pretence that this law (which levies a tax on foreign corporations), is an unjust discrimination against them, as compared with our own corporations, is not true in point of fact. To make it true in fact, it should appear that both do business under the same circumstances and under the like penalties and control.

Yet it is obvious that our stringent laws against fraudulent and insolvent corporations and our summary remedies cannot touch the foreign corporations at all. Many of our own corporations, doubtless, would gladly compromise by payment of the tax, could they at the same time be relieved from the penalties. The argument of the counsel of the defendants, which would give to every foreign corporation all the business rights which our own corporations and own citizens enjoy (exempted, at the same time, as they are and must be, from many of the

responsibilities), would be an unjust discrimination against ourselves.

No case has been cited which holds these laws unconstitutional save one, which the counsel refers to from a newspaper, and infers that the law under which the alleged decision was made is like our own. These laws exist, I find, in many, if not in most of the states, and the very fact that such cases are wanting is plenary evidence against the alleged unconstitutionality of these laws. The opinion of distinguished counsel, referred to in the brief on behalf of the defendant, might have been quite formidable had the reasons or grounds of opinion not been assigned; but as it is, I submit they are but of little weight. They proceed upon the assumption that a corporation is a citizen in the sense intended in the constitution. That is the very point to be proved; yet not a case is cited, nor even an argument or a plausible reason assigned, to support the position.

I may add, in this connection, as an offset to these opinions, that I now have before me the written opinions of Governor Vroom and ex-Attorney General Browning, in favor of the validity of the New Jersey act.